2024 IL App (1st) 232347-U

FIFTH DIVISION
December 27, 2024

No. 1-23-2347

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| DORIAN WOODS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Petition for Review of an |
| v. | ) | Order of the Illinois Human |
| | ) | Rights Commission. |
| ILLINOIS HUMAN RIGHTS COMMISSION, ILLINOIS | ) | |
| DEPARTMENT OF HUMAN RIGHTS, and TURANO | ) | Charge No. 2014 CF 1647. |
| BAKING COMPANY, | ) | |
| | ) | |
| Respondents. | ) | |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The Commission's decision is affirmed where appellant cannot show that the Commission's findings were against the manifest weight of the evidence or any other basis for overturning its decision.

¶ 2   Petitioner Dorian Woods appeals from a final order entered by the Illinois Human Rights Commission (Commission), adopting and declining further review of the recommended order and decision of the administrative law judge (ALJ). Mr. Woods argues that the ALJ made several errors in his recommendation that the Commission dismiss charges of racial harassment and

discrimination brought against Turano Baking Company, Mr. Woods's former employer. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4                A. Mr. Woods's Employment with Turano Baking Company

¶ 5    Mr. Woods, an African American man, was a probationary trainee for Turano Baking Company (Turano) for a total of 29 days between October 19, 2013, and November 15, 2013. Mr. Woods was hired to fill a new route in Indiana, created to alleviate pressure on two nearby existing routes. Following company protocol to create and staff this route, Turano first notified current employees of the new position and then made the role available to external applicants. Six or seven external candidates were considered, several of whom were white. District managers Glenn Hurt and Timothy Banike and human resources director Sharon Kacsits interviewed the finalists and selected Mr. Woods. Their selection was based on Mr. Woods's prior experience in the industry and his interview.

¶ 6    Mr. Woods began his employment orientation on October 11, 2013, which included a discussion of Turano's anti-harassment and anti-discrimination policies as well as its internal complaint procedure. On October 14, 2013, Mr. Woods started training at Turano. New hires spend their first 30 days as probationary trainees where they drive a route and conduct deliveries alongside a senior route salesperson. The goal of this period is to assess the trainee's performance and determine if they should remain at the company. Mr. Woods was first assigned to work with Turano employees on a route in northern Illinois and then spent several days working on a route in Northwest Indiana, where the new route he was hired to drive would be based.

¶ 7    This new route opened on Mr. Woods's third week with Turano. Mr. Woods continued his training with Mr. Hurt, who was to be his immediate supervisor. When Mr. Hurt was on vacation,

2

Mr. Banike observed and reviewed Mr. Woods.

¶ 8    On November 12, 2013, Mr. Hurt sent Mr. Banike and another Turano employee an email detailing numerous issues he noticed during Mr. Woods's training. According to the email, Mr. Woods was "making mistakes," "not grasping the information being taught," and "not display[ing] the qualities we expect from our route salesmen." Mr. Banike then submitted the Turano standard "Probation Report" on Mr. Woods. The report details criteria on which trainees are evaluated, such as skills, personal characteristics, and job performance. Pursuant to Turano policy, trainees must receive 36 points to remain employed with Turano. Mr. Woods received 31 points. Later that same day, a representative from Turano's human resources department shared these results with Mr. Woods and informed him that he was discharged from his position.

¶ 9          B. Mr. Woods's Allegations of Harassment and Discrimination

¶ 10   On December 20, 2013, Mr. Woods filed a charge of discrimination against Turano with the Illinois Department of Human Rights (Department) and the Equal Employment and Opportunity Commission alleging racial harassment and discrimination in violation of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.*). On December 3, 2014, the Department entered a notice of substantial evidence, enabling Mr. Woods to file a verified complaint with the Commission on March 3, 2015. The complaint included two counts—one for racial harassment and one for racial discrimination.

¶ 11   The allegations underlying each of these counts were Mr. Woods's termination, his being assigned an Indiana route, and several race-based comments. Mr. Woods alleged that his assignment to the Indiana route, rather than one in Chicago, was an act of racial harassment and discrimination. Mr. Woods further alleged that Mr. Hurt and Mr. Banike made racially charged comments on four occasions amounting to racial harassment and proving that Turano's non-

discriminatory reason for his termination—poor performance—was a pretext for racial discrimination.

¶ 12                                C. Public Hearing

¶ 13    A public hearing was held on August 17 and 18, 2021, before Administrative Law Judge William Borah (ALJ Borah). Entered into the record as exhibits were the parties' "uncontested" facts, Turano's employee handbook, Turano's anti-harassment policy, a November 12, 2013, an email from Mr. Hurt discussing Mr. Woods's performance, and Mr. Woods's "Probation Report." The parties also presented witnesses. Mr. Woods called two witnesses: Leroy Spencer and himself. Turano called four witnesses: Martha Gonzalez, Mr. Hurt, Mr. Banike, and Mr. Hall.

¶ 14    Mr. Woods first called Mr. Spencer, one of his friends in whom he had confided about his experience at Turano, who testified that Mr. Woods expressed frustration with his job at Turano after three weeks. Specifically, Mr. Woods complained about management's treatment of him, being assigned an unfamiliar route, and being "called some type of name"—"a racial epithet."

¶ 15    Mr. Woods testified that he was told Turano was hiring for a downtown Chicago route, which he specifically wanted to apply for because he was familiar with the area. During training, Mr. Woods rode along with three drivers, all of whom signed off on his performance. However, after a call from Mr. Hurt, Mr. Woods felt a negative shift in the environment with one trainer. Mr. Hurt later trained Mr. Woods in Indiana, making several negative and racially charged comments.

¶ 16    Mr. Woods said that, while out on a shift, Mr. Hurt told him he "should [feel] privileged to be working there because they [referring to Turano] do not really hire blacks." Later, on his last day of training with Mr. Hurt, Mr. Banike called Mr. Woods to explain that he would be Mr. Woods's new supervisor while Mr. Hurt was on vacation. At the end of the phone call, Mr. Woods heard Mr. Banike say "this will be the last n*** we hire" to an unknown third party. Mr. Woods

then tried calling Ms. Gonzalez in human resources to report the incident but did not get ahold of her.

¶ 17    Mr. Woods also testified that he saw Mr. Banike instructing loaders to place empty trays behind his truck, making him late for deliveries. He testified that when he confronted Mr. Banike about this, Mr. Banike replied, "[T]his is why we don't hire blacks." Mr. Woods attempted to contact human resources again but did not receive a response.

¶ 18    Later in the same day, after finishing his route, he was terminated without explanation by Ms. Gonzalez. Mr. Woods testified that as he was being escorted to his car, Mr. Banike said, "[W]e got rid of that n***. Let's see if he can prove it."

¶ 19    On cross-examination, Mr. Woods acknowledged receiving Turano's handbook and policies but admitted he never used the internal complaint procedure, opting instead to leave voicemails for human resources. Mr. Woods also admitted that he was late to a customer location on at least one occasion but could not recall whether he confused customer orders or ran out of certain products.

¶ 20    Turano first called Ms. Gonzalez, who worked in their human resources department since 2005. She testified that Turano's anti-discrimination and anti-harassment policy required employees to report issues to human resources or upper management. She testified that Mr. Woods never complained to her about discrimination or harassment, nor did he attempt to contact her. During Mr. Woods's termination meeting, he did not dispute his performance evaluation or raise any complaints.

¶ 21    Next, Mr. Hurt, a long-time district manager at Turano, testified about the hiring process for Mr. Woods. Turano was hiring an additional driver to specifically alleviate the workload on routes 42 and 79 in Northwest Indiana. Mr. Hurt noted that he was not hiring for a route in Chicago.

He interviewed six or seven candidates, two of whom were white, and ultimately recommended Mr. Woods for the position. However, after training, Mr. Woods struggled with his performance, making mistakes and failing to show up on time. Mr. Hurt felt that Mr. Woods should not advance to a full-time role. He also stated he never made any racially charged comments.

¶ 22    Mr. Banike, another district manager, supported Mr. Hurt's evaluation of Mr. Woods, stating that he performed satisfactorily in some areas but poorly in others. He also denied making any racist comments and directing anyone to interfere with Mr. Woods's work.

¶ 23    Mr. Hall, a long-time employee, confirmed he did not witness any racial harassment or mistreatment during the termination process. He noted that Mr. Woods did not express any complaints or concerns to him during his employment.

¶ 24    After the hearing, ALJ Borah found in favor of Turano on both the harassment and discrimination claims, concluding that Mr. Woods failed to provide credible evidence of racial animus or harassment. He reviewed each of Mr. Woods's allegations and determined that none were credible or fell within the protections outlined by the Act. In his decision, ALJ Borah highlighted the reliability of Turano's witnesses, the absence of any complaints from Mr. Woods during his employment, and the documented performance issues that ultimately led to his termination.

¶ 25    The ALJ's decision gave Mr. Hurt and Mr. Banike the benefit of the "same actor inference." The ALJ concluded: "The fact that [Mr. Woods], an African American, was hired at the start of the 29 days of training, and discharged by the same individuals, Hunt and Banike, undermines the contention that [Turano] fostered race animus."

¶ 26    ALJ Borah found that any claim that Mr. Woods was reassigned to Indiana as an act of harassment or discrimination was "moot" because Mr. Woods was only a trainee and was never

6

assigned to a route as a full-time employee. He also noted that Mr. Woods failed to present any tangible evidence that his assignment to the Indiana route was the result of racial harassment or discrimination such as a copy of the posted notice of the position, emails, job description, or testimony mentioning the Chicago route that Mr. Woods allegedly thought he was getting.

¶ 27     ALJ Borah found that none of the four race-based comments allegedly directed towards Mr. Woods rose to an actionable level of harassment. He reasoned that the first remark, that "[Mr. Woods] should feel privileged because they do not really hire blacks," was  vague as to its meaning and purpose and could even be interpreted as a criticism of Turano's past hiring practices as opposed to a derogatory slur directed at Mr. Woods. Regarding the second comment, "this is why [Turano doesn't] hire blacks," ALJ Borah reasoned that Mr. Woods's own admission that he did not actually hear Mr. Banike instruct employees to block his truck, undermined his credibility as to whether this comment, which Mr. Banike denied making, had ever been made.

¶ 28     ALJ Borah acknowledged the gravity of the use of the N-word and its ability to quickly create an abusive working environment, referring to it as the "nuclear bomb of racial epithets." But ALJ Borah found Mr. Woods's third allegation, that he had heard Mr. Banike refer to him with this word, uncredible, reasoning that Mr. Woods's decision to wait and raise his complaint only after his termination "undermines his own credibility and may reveal his own bias for testimonial vagueness against [Turano], as well as a basis for exaggeration or embellishment." He added that the testimony of Mr. Woods's own witness—that Mr. Woods spoke with him about his supervisors at Turano multiple times, but did not remember him mentioning the N-word—further undermined the credibility of the allegation.

¶ 29     ALJ Borah disposed of the final comment because it was allegedly made when Mr. Woods was being escorted to his car following his termination with the company. Mr. Woods was

therefore no longer an employee pursuant to the Act and this last comment was not actionable.

¶ 30   Regarding the discrimination claim, ALJ Borah concluded that Mr. Woods failed to establish a *prima facie* case because Turano's reasons for Mr. Woods's dismissal were valid and not pretextual. Mr. Woods was not meeting Turano's legitimate employment expectations and failed to demonstrate that a non-Black employee was treated more favorably under similar circumstances.

¶ 31   On April 14, 2023, ALJ Borah issued his recommended decision that Mr. Woods's complaint be dismissed with prejudice. ALJ Borah found that Mr. Woods failed to establish a *prima facie* case of racial discrimination and racial harassment by a preponderance of the evidence.

¶ 32   The Commission declined further review on November 7, 2023, and adopted the ALJ's recommended order and decision as its own. This appeal follows.

¶ 33                                    II. JURISDICTION

¶ 34   The only respondent named in this case is Turano. However, Supreme Court Rule 335 requires petitioners to name the administrative agency whose decision is being appealed from as a party and so the Commission has filed a brief as an unnamed respondent. Ill. S. Ct. R. 335 (eff. July 1, 2017). Mr. Woods has filed a reply brief in response to the Commission's brief. Thus, Mr. Woods's failure to name the Commission as a party appears not to be an issue.

¶ 35   However, the Commission previously moved to dismiss the appeal for lack of jurisdiction based on a late notice of appeal, and this court denied the motion. The Commission raises its argument again in its brief on appeal. In addition, we have an independent duty to determine whether we have jurisdiction, and we may reconsider our ruling on a motion to dismiss an appeal at any time before the disposition of the appeal. *In re Marriage of Waddick*, 373 Ill.App.3d 703, 705 (2007). Thus, we will address this jurisdictional argument.

¶ 36   The Act (775 ILCS 5/8-111(B)(1) (West 2022)), and Illinois Supreme Court Rule 335 (eff. July 1, 2017), require the filing of a petition for review of a decision of the Commission in the appellate court within 35 days of service of the Commission's order. Mr. Woods, therefore, needed to file his petition for review by December 12, 2023, within 35 days of the Commission's final administrative decision sent November 7, 2023.

¶ 37   The Commission argues that Mr. Woods's notice of appeal—which he later substituted for a petition for review with leave of court—is untimely. The Commission notes that the notice of appeal is stamped by this court's clerk's office at 4:37 a.m. on December 13, 2023, which is a day too late.

¶ 38   Mr. Woods does not respond to this argument in his reply brief, contending incorrectly that it was definitively resolved by our denial of the Commission's motion to dismiss. However, he responded to the motion to dismiss by demonstrating that his notice of appeal was timely. According to Mr. Woods, he first submitted a notice of appeal in this court on December 7, 2023, but was instructed by the appellate court clerk that his notice needed to be file-stamped by the Commission. Mr. Woods then refiled his notice of appeal on December 8, 2023, this time with the stamp from the Commission, dated December 7, 2023, that he had been instructed to get. On December 13, 2023, this court's clerk's office accepted and docketed the notice of appeal. The critical date, as Mr. Woods points out, is when he filed his notice, which was at least four days before the deadline of December 12, 2023.

¶ 39   Mr. Woods's timeline is consistent with this court's docketing system and with the documentation that Mr. Woods has submitted. According to this court's docketing system, Mr. Woods filed his notice of appeal in the circuit court on December 7, 2023. This is the date stamped onto the notice of appeal by the Commission. December 7, 2023, is also the date noted on this

court's docket, because this court's clerk's office is accustomed to using the date that a notice is filed in the circuit court as the effective date of the notice of appeal.

¶ 40    This court's clerk's office's internal records confirm that Mr. Woods filed his notice, stamped by the Commission with the date of December 7, 2023, on December 8, 2023, at 10:37 a.m. This court's clerk's office's internal records reflect that this notice was accepted and docketed on December 13, 2023, at 2:04 p.m. The December 13, 2023, 4:37 a.m. time stamp from the clerk's office simply has the wrong time on it and should reflect the 2:04 p.m. time that the notice of appeal was accepted and docketed. That time stamp, which is placed on the notice by the clerk's office, has nothing to do with the date that Mr. Woods filed his notice of appeal. Thus, all the written documentation in the court's docketing system is consistent with Mr. Woods's explanation as to the timing of his notice of appeal.

¶ 41    On December 13, 2023, the clerk of this court informed Mr. Woods that he had submitted the incorrect form and needed to file a petition for review under Supreme Court Rule 335, rather than a notice of appeal. Mr. Woods filed a motion to substitute the previous notice of appeal with the petition for review that same day. No objection to this motion for substitution was filed, and we granted that motion on December 27, 2023. Thus, the substitution with the proper appeal notice—a petition for review—was allowed.

¶ 42    A notice is sufficient to confer jurisdiction if, "considered as a whole and construed liberally, it fairly and adequately identifies the complained-of judgment." *People v. Lewis*, 234 Ill. 2d 32, 37 (2009). While the Act and Rule 335 require the filing of a petition for review, rather than a notice of appeal, Mr. Woods's first filing with this court, his notice of appeal, was timely filed. Indeed, the Commission does not dispute that this is sufficient to give us jurisdiction. Rather, its argument assumes that the notice of appeal was adequate to provide this court with jurisdiction if

it was timely filed. For the reasons set forth above, it clearly was timely. This court therefore has jurisdiction over this appeal.

¶ 43                                      III. ANALYSIS

¶ 44    The Act aims to prohibit discrimination based on various factors, including race, in the workplace. 775 ILCS 5/1-101 *et seq*. To support this goal, the Act forbids employers from participating in unlawful harassment or discrimination. *Id.* A petitioner may prove discrimination by presenting direct evidence that race was a determining factor in the employment decision, or he may use the indirect method of proof for Title VII cases set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lalvani v. Illinois Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001).

¶ 45    Under *McDonnell Douglas*, the petitioner must demonstrate that (1) they belong to a protected class, (2) they met the respondent's legitimate performance expectations, (3) the respondent took adverse action against them, and (4) similarly situated employees outside of their protected class were treated more favorably. *Young v. Illinois Human Rights Comm'n*, 2012 IL App 112204, ¶ 34. Once these elements are established, the burden shifts to the employer to articulate, rather than prove, a legitimate non-discriminatory reason for the adverse action taken. *Glenn v. Human Rights Comm'n*, 2020 IL App 91857-U, ¶ 24.

¶ 46    Racial harassment has been defined as a steady barrage of derogatory racial comments, severe and pervasive enough to alter the conditions of employment and create a hostile and abusive working environment. *Johnson v. Bunny Bread Co*., 646 F.2d 1250, 1257 (8th Cir. 1981). While harassment is a separate cause of action, racial harassment may also be found to constitute racial discrimination within the meaning of the Act. *Village of Bellwood Board of Fire and Police Commissioners v. Human Rights Comm'n*, 184 Ill.App.3d 350, 351 (1989) ("The ALJ concluded

11

that the racially charged atmosphere at the police department amounted to racial harassment, and thus constituted discrimination based upon race within the meaning of the [Act]."")

¶ 47    Here, Mr. Woods brought two separate charges and the Commission analyzed each cause of action separately. As both the Commission and Mr. Woods recognized, the evidence of harassment could also support the discrimination claim and the Commission's decision referred to several of Mr. Woods's allegations as acts of "race harassment and/or discrimination." We recognize this interrelatedness in our examination of Mr. Woods's contentions on appeal.

¶ 48    On appeal, Mr. Woods argues that the Commission erred in its finding that he did not experience actionable racial harassment or discrimination. Specifically, he argues that the Commission erred in (1) holding that his reassignment to an Indiana route was not an act of discrimination, (2) ruling that a racial slur directed at Mr. Woods was not actionable because it was said after his employment was terminated, (3) concluding that Mr. Woods was not meeting Turano's legitimate employment expectations, (4) determining that Mr. Woods could not prove that similarly situated employees were treated more favorably, and (5) separately considering each instance of harassment and discrimination rather than viewing them in totality.

¶ 49    Our standard of review of the Commission's decision depends on whether the issue presented is a question of law or fact. *Board of Education of the City of Chicago v. Illinois Educational Labor Relations Board*, 2015 IL 118043, ¶ 14. An administrative agency's decision on a question of law, including its interpretations of statutes, is reviewed *de novo*. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142 (2006). An administrative agency's determination on a question of fact is afforded great deference and will be reversed only if it is against the manifest weight of the evidence. *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 379 Ill. App. 3d 22, 26 (2007). We will not reassess the

evidence, reevaluate the Commission's credibility determinations regarding witnesses, or second-guess the reasonable inferences drawn by the Commission. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989). We defer to the agency's findings on credibility because the hearing officer was present to observe the witnesses' testimonies and was best equipped to evaluate their credibility and the weight of their statements. *Crossman v. Board of Election Commissioners of City of Chicago*, 2012 IL App 120291, ¶ 14. If there is any evidence in the record supporting an administrative agency's decision, that decision cannot be considered against the clear weight of the evidence and must be upheld in judicial review. *Lipsey v. Illinois Human Rights Comm'n*, 157 Ill. App. 3d 1054, 1065 (1987).

¶ 50        A. The Commission Properly Considered the Totality of the Circumstances

¶ 51        Mr. Woods argued that his route assignment and several race-based comments directed at him constituted harassment. The Commission did not find any of these allegations to constitute actionable harassment or amount to discrimination. On appeal, Mr. Woods takes issue with some of ALJ Borah's individual findings and argues that the ALJ "improperly balkanized" each instance of harassment rather than considering the totality of the circumstances.

¶ 52        It is clear to us that the ALJ's thorough examination of each individual allegation does not mean that the totality of the circumstances was not considered. ALJ Borah examined each alleged statement to determine whether (1) it was made as alleged and (2) the context would support its consideration as evidence of harassment or discrimination. The ALJ then reached an overarching conclusion that no actionable harassment or discrimination occurred. This finding is supported by the evidence.

¶ 53        Mr. Woods first alleged that on November 9, 2013, Mr. Hurt told him, "He should feel privileged, because [Turano does] not really hire blacks." ALJ Borah made no finding that this

13

comment was actually made. Rather, he *assumed* that it had been and focused on whether it was, in context, racial harassment. ALJ Borah reasoned that, at best, the statement's objective meaning is vague and could even be interpreted as criticism of Turano's past hiring practices rather than reflecting discrimination. ALJ Borah acknowledged that Mr. Woods testified he found the remark offensive and discriminatory, but noted that only an objective inquiry into the meaning of the remark and the context surrounding it were relevant in determining whether actionable harassment occurred. The ALJ concluded, "Here, [Mr. Woods] failed to show by the preponderance of the evidence the objective 'context' of the statement and, as such failed to prove the actionable level of race harassment." This conclusion is not contrary to the manifest weight of the evidence.

¶ 54    A second remark is alleged to have occurred after Mr. Woods confronted Mr. Banike about allegedly directing employees to place empty trays in a way that prevented Mr. Woods from loading his truck. When Mr. Woods confronted Mr. Banike, Mr. Banike allegedly responded, "[T]his is why they don't hire blacks." ALJ Borah concluded that he did not believe this remark was made. ALJ Borah listened to two versions of what had occurred and accepted Mr. Banike's version of events. According to Mr. Banike, he explained to Mr. Woods that the practice of stacking empty trays was not sabotage but, rather, part of an established procedure. ALJ Borah reasoned, "Without proof of [Mr. Banike's directive to the loaders to interfere with Mr. Woods doing his job], the alleged remark is out of place, especially said by a person who hired [Mr. Woods] just days before this incident." We defer to that judgment because it is not against the manifest weight of the evidence.

¶ 55    A third allegation stemmed from a phone call between Mr. Woods and Mr. Banike. Mr. Woods alleged that after Mr. Banike thought the call had ended, he heard Mr. Banike tell an unknown third party that "this will be the last n*** we hire." ALJ Borah concluded that this

14

allegation was not credible because it was such an explosive allegation and Mr. Woods failed to properly raise an internal or external complaint until after he was discharged for poor performance. ALJ Borah also highlighted that Mr. Spencer, Mr. Woods's own friend and witness, could not recall Mr. Woods ever telling him he was called the N-word in their numerous conversations about Turano. He reasoned, "Such a term is not soon forgotten by the listener." We do not find ALJ Borah's credibility conclusion to be against the manifest weight of the evidence.

¶ 56    Mr. Woods argues, "[T]aken in its totality, the numerous instances of racist comments and conduct amount to harassment, discrimination, and a testament to the hostile work environment Mr. Woods was subjected to in violation of the [Act]." But there is nothing to suggest that ALJ Borah failed to consider the totality of the circumstances in his analysis. He wrote, "After taking all testimony and exhibits into account, [Mr. Woods] has failed to show, by the preponderance of the evidence that, as a result of his race, African American, he was harassed in the workplace." The Commission, in accepting the ALJ's recommended decision and order, concluded that, individually and in totality, these statements did not rise to a level of actionable harassment or discrimination. We do not believe this finding, or the findings as to the individual allegations, are against the manifest weight of the evidence.

¶ 57    B. The Commission Did Not Err in Finding Post-Employment Harassment Not Actionable

¶ 58    Mr. Woods alleges that another racist remark was made just after he was terminated. According to Mr. Woods, as he was being escorted to his car, Mr. Banike said, "[W]e got rid of that n***. Let's see if he can prove it." Mr. Woods argues that the Commission erred as a matter of law when it ruled that this comment was not actionable because he was no longer an "employee" as that term is defined by section 2-101(A) of the Act. 775 ILCS 5/2-101(A) (West 2022). We agree with the Commission's conclusion that this post-employment remark was not actionable.

¶ 59 Mr. Woods does not dispute that the Act defines an employee as someone who is currently performing services for an employer. *Id.* Nor does he dispute that his claim is for discrimination and harassment in employment.

¶ 60 Mr. Woods offers no case in which this court has found a post-employment comment to be actionable. He cites *Gusciara v. Lustig*, 346 Ill. App. 3d 1012 (2004), which found that courts may consider harassing acts occurring outside the statute of limitations period if any act contributing to the hostile work environment is within the statute of limitations. However, the harassing acts in that case occurred while the petitioner was still employed.

¶ 61 Mr. Woods also relies on *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 713 (7th Cir. 2008), in which the Seventh Circuit held that a claim of post-employment *retaliation* is actionable under Title VII. But, as this court has made clear, retaliation is different than discrimination because an employer may continue to retaliate, with bad job references for example, against a petitioner who has left the work force, whereas discrimination and harassment claims must concern conduct in the work place itself. See *Owens v. Department of Human Rights*, 403 Ill. App.3d 899, 922 (2010) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)) ("[T]he Supreme Court expressly distinguished claims of substantive employment discrimination, such as the one here, from claims of retaliation, explaining that substantive discrimination claims are limited to actions that affect the employee's terms and conditions of employment.")

¶ 62 We agree with Mr. Woods, however, that if this evidence were believed, it could constitute evidence of racial animus that would support the rest of his claim. See *Dubnick v. Firestone Tire & Rubber Co. of California*, 355 F.Supp. 138 (E.D.N.Y.1973) (post-employment letters may be relevant to charges of discriminatory conduct during the plaintiff's employment). However, we agree with the Commission that when we look at the ALJ's consideration of this allegation in

context, it is apparent that the ALJ implicitly found Mr. Woods's claim that this statement was made was simply not credible.

¶ 63    The ALJ made no explicit finding that this statement was not made, but did find that another alleged use of the N-word by Mr. Banike did not occur and the ALJ's reasoning applies fully to this statement as well. In reaching the conclusion that Mr. Banike did not refer to Mr. Woods by the N-word to an unknown third person after a phone call, ALJ Borah highlighted the fact that the use of this word is so explosive and that Mr. Woods made no complaint until after he was terminated for poor performance. He also pointed out that Mr. Woods's own witness could not recall whether Mr. Woods mentioned the N-word to him when discussing his issues at Turano. "Such a term is not soon forgotten by the listener," he reasoned. This same reasoning supports the hearing officer's implicit conclusion that Mr. Woods's allegation that Mr. Banike used the N-word a second time was not credible. As we have recognized in other cases, we are entitled to rely on what appear to be, in the context of the decision as a whole, implicit credibility findings made by an administrative agency. See *Williams v. Department of Employment Security*, 2016 IL App 142376, ¶ 62 (the context of Board's decision supported a finding that claimant's testimony was not credible); *Lo Piccolo v. Department of Registration & Education*, 5 Ill. App. 3d 1077, 1083 (1972) (accepting implicit credibility findings in agency's decision).

¶ 64            C. The Commission Did Not Err in Finding that Mr. Woods's

            Route Assignment Did Not Constitute Harassment or Discrimination

¶ 65    Mr. Woods argues that ALJ Borah improperly failed to consider his claim that his reassignment to an Indiana route was an act of discrimination because it made it more difficult for him to demonstrate his competence and obtain full-time employment. Mr. Woods is correct that a reassignment of job duties that interferes with the employee's work conditions and performance

17

may be evidence of discrimination or, if materially adverse, may be actionable on its own. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006). But that is not what happened in this case.

¶ 66    ALJ Borah concluded that "whether the route was downtown Chicago or Northwest Indiana is moot, as [Mr. Woods] was never assigned to any route as a full-time employee of [Turano]." We agree with ALJ Borah that the fact that Mr. Woods was a probationary trainee with Turano and never assigned to a full-time route means he could not have been "reassigned" as an act of discrimination or harassment.

¶ 67    Despite his belief that this claim was moot, ALJ Borah considered the evidence that supported any claim that Mr. Woods had been lured by the promise of a Chicago route that was then changed to an Indiana route after he started with the company. Turano witnesses testified that the company followed its standard protocol to create and staff the new route in Indiana. Mr. Woods was given materials pertaining to this Indiana route and was introduced to its customers. He never trained on a route in downtown Chicago. ALJ Borah explicitly noted that he found this testimony to be credible. While Mr. Woods testified that he thought he was going to get a Chicago route, ALJ Borah noted, "[Mr. Woods] failed to present any tangible evidence that may have existed to support his allegation that the routes were switched as an 'adverse act' of race harassment. (e.g. a copy of the posted notice of the position, emails, job description, website, or testimony from other interviewers who may have been present, salary differences, etc.)" The ALJ's finding that there was no switch in routes from Chicago to Indiana was not against the manifest weight of the evidence.

¶ 68        C. The Commission Did Not Err in Finding that Mr. Woods

Was Not Meeting Turano's Legitimate Employment Expectations

¶ 69    Mr. Woods argues that the Commission incorrectly concluded that he was not meeting Turano's legitimate employment expectations. ALJ Borah reasoned, "[Mr. Woods] admitted to delivering the wrong product, having the incorrect number of products to deliver, confusing customers, being tardy, and failed to remove products from the store shelves once the expirations dates had passed." However, while Mr. Woods admitted that on at least one occasion he was late to training, he never explicitly admitted to those other misdeeds. Rather, when asked whether he confused customer orders and had the incorrect number of products, Mr. Woods replied multiple times that he did not remember. Thus, while there was no admission by Mr. Woods, he also offered no evidence to contradict the testimony from Turano employees that he was not meeting the company's legitimate expectations.

¶ 70    There was detailed testimony from Turano supervisors and an email complaint and probationary report that documented Mr. Woods's numerous performance deficiencies, including that he had confused customers and products. It was uncontradicted that Mr. Woods received a total score of 31 points on his final probationary report and was required to obtain a minimum of 36 points to remain employed. Mr. Woods argues that the performance criteria are all subjective. But the record contains detailed testimony explaining each area in which Mr. Woods was evaluated and why he received a particular score. There was uncontradicted evidence of mistakes that Mr. Woods made during his short time with Turano, including shorting some customers and delivering the wrong products to others. Thus, even if some of the criteria used in the performance review was subjective such as "initiative" or "eagerness to learn," Mr. Woods offered no evidence to suggest that his low scores on quality or quantity of work were a pretext for racial discrimination.

In short, the Commission's factual finding that Mr. Woods cannot make out a *prima facie* case because he was not meeting his employer's legitimate expectations was not contrary to the manifest weight of the evidence.

¶ 71          E. The Commission Did Not Err in Finding that Mr. Woods

Failed to Establish Similarly Situated Employees Were Treated More Favorably

¶ 72    Mr. Woods argues that the Commission incorrectly determined that he could not prove similarly situated employees were treated more favorably. At the outset, we note that we need not address the final element of Mr. Woods's *prima facie* case because he failed to establish that he was meeting legitimate employment expectations. Nevertheless, we address the merits of his final argument on appeal.

¶ 73    Mr. Woods correctly notes that courts accept circumstantial evidence of discrimination because direct evidence is so rare in modern employment cases. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1028 (7th Cir. 2004). Under this indirect approach, a plaintiff must demonstrate that a similarly situated employee outside their protected class was treated more favorably. *Id*. The requirement of identifying a similarly situated employee ought to be liberally construed and is not meant to be onerous. *Ortiz v. Norton*, 254 F.3d 889, 895 (10th Cir. 2001).

¶ 74    We are unpersuaded by Mr. Woods's argument that the alleged use of the N-word "clearly demonstrates that white employees were not subjected to similar rhetoric because the comments were made as a response to Mr. Woods' [*sic*] race." Because we accepted ALJ Borah's conclusion that the allegations were not credible, those allegations cannot sustain a claim that white employees were treated differently. The only other claim that Mr. Woods makes of differential treatment is made for the first time in his reply brief and is addressed in the next section.

¶ 75                    F. Arguments Made for the First Time in Reply

¶ 76    In his reply brief, Mr. Woods raises three arguments for the first time on appeal. He contends that the ALJ erred by (1) excluding testimony about different treatment of another non-Black employees; (2) refusing to allow Mr. Spencer to testify about Mr. Wood's difficulty in finding another job and the fact that "it was like that in the baking industry, once the word got out on you, you pretty much blackballed" and not allowing Mr. Woods to make an offer of proof; and (3) applying the same-actor inference despite evidence that Mr. Hurt and Mr. Banike harbored racial animus. This last argument may not have been forfeited since it was offered in response to Turano's argument that the ALJ properly gave Turano the benefit of the same actor inference. However, to the extent that any of these arguments are not forfeited, they are without merit.

¶ 77    Pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." In this case, these evidentiary points are particularly difficult to consider because neither Turano nor the Commission have had any opportunity to respond to them. Accordingly, we can and do view all these claims as forfeited.

¶ 78    We also reject these claims on the merits. The testimony that Mr. Woods seeks to rely on about another employee being treated more favorably was properly excluded as inadmissible hearsay. Mr. Woods testified that, during his training, another employee told him not to leave his keys in the car and explained that this employee had left the keys in the vehicle and it had been stolen. That employee had not been fired. The ALJ sustained an objection and struck the testimony. Mr. Woods's testimony about what another employee told him, offered as it was, for the truth of the matter asserted, was clearly inadmissible hearsay. Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 79    Mr. Woods also claims that the ALJ improperly struck Mr. Spencer's testimony about Mr.

21

Woods being blackballed after he lost his job at Turano. While we agree that the proper procedure would have been to allow Mr. Woods's counsel to make an offer of proof, we do not see how this testimony explains Mr. Woods's failure to report racial harassment and can imagine no scenario under which Mr. Spencer would have the expertise to offer admissible testimony on what happens generally in the baking industry after an employee is terminated.

¶ 80     Finally, we find no error in the ALJ's application of the same actor inference. The decision to apply the same actor inference and the determination of how much weight it should be given is flexible and depends on a number of factors like the length of time between hiring and firing an employee. *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 464 (6th Cir.1995). Mr. Woods has not shown that the Commission erred in using this inference or that the conclusions drawn from it are against the manifest weight of the evidence. Rather, in reply to Turano, Mr. Woods argues that Mr. Hurt's admission, in an unrelated case, that he had used the N-word before is relevant in showing that Mr. Hurt may harbor racial animus and therefore should not be entitled to the benefit of the same actor inference. We agree that Mr. Hurt's admission, or other evidence of racial animus, is relevant in determining whether it may be appropriate to infer a lack of discrimination. But this testimony is not enough to show that ALJ Borah's carefully reasoned conclusions and credibility determinations are against the manifest weight of the evidence. And, ALJ Borah's decision not to allow this testimony is within the scope of his authority to manage hearings and consistent with the Illinois Rules of Evidence. (1 Ill. Admin. Code 5300.530 (eff. June 1, 1996); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person, in order to show action in conformity therewith…").

¶ 81                                    IV. CONCLUSION

¶ 82     Mr. Woods failed to demonstrate that the Commission's decision to dismiss his harassment

and discrimination claims was against the manifest weight of the evidence. The Commission appropriately concluded that Mr. Woods's reassignment to an Indiana route did not constitute discrimination, and it properly found his allegations of racial comments either not actionable or unsubstantiated. In reaching this conclusion, ALJ Borah properly evaluated the evidence, considering both the individual allegations and the overall context. Mr. Woods did not establish that any of the Commission's findings were contrary to the manifest weight of the evidence. Furthermore, Mr. Woods failed to present evidence showing that he met Turano's legitimate employment expectations or that similarly situated employees were treated more favorably. Accordingly, we affirm the Commission's dismissal of Mr. Woods's complaint.

¶ 83    Affirmed.